## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | Criminal Action |
| CHRISTOPHER THOMPSON; ) | No. 16-10014-PBS |
| KIMBERLY THOMPSON; ) | |
| AIR QUALITY EXPERTS, INC.; and ) | |
| AQE, INC., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## MEMORANDUM AND ORDER

September 13, 2016

Saris, C.J.

## INTRODUCTION

Christopher Thompson, Kimberly Thompson, Air Quality Experts, Inc. ("Air Quality"), and AQE, Inc. ("AQE") (collectively, "defendants") are charged with mail fraud, theft or embezzlement from an employee benefit plan, and making false ERISA statements. The indictment alleges that the defendants made false reports to the Massachusetts Laborers' Benefit Fund ("MLBF") and, based on those reports, failed to make payments due to the MLBF.

The defendants moved to dismiss the indictment. They argued that, under the facts as alleged, their representations were not false and they did not fail to pay any money to which the

1

alleged victim was entitled. For the reasons below, the
defendants' motion (Docket No. 39) is **DENIED**.

## FACTUAL BACKGROUND

The following facts stated in the indictment are taken as
true for the purpose of a motion to dismiss the indictment.
Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 343 n.16
(1952).

At times relevant to the indictment, Air Quality was an
asbestos abatement company incorporated in New Hampshire in
1987. AQE was an asbestos abatement company incorporated in New
Hampshire in 2005.

Christopher and Kimberly Thompson together owned and
operated Air Quality and AQE. Christopher Thompson was the
president and treasurer of Air Quality. Kimberly Thompson, his
wife, was the president of AQE and the clerk of Air Quality.

On or about September 22, 2005, AQE agreed to be bound by
any collective bargaining agreement ("CBA") between the
Massachusetts Laborers' District Council of the Laborers'
International Union of North America and the Massachusetts
Building Wreckers and Environmental Remediation Association,
Inc. During the relevant time period, there were three
consecutive CBAs that spanned the dates of July 1, 2004 to June
30, 2016. The CBAs governed the remittance of fringe benefit
contributions to a number of employee welfare and pension

2

benefit plans, some of which were subject to the provisions of Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"). Under the terms of the CBAs, AQE was obligated to make monthly "remittance reports" to the MLBF that reported the number of hours worked by union members for AQE and to make benefit contributions to the MLBF based on those hours.

There is no suggestion in the indictment or by either of the parties that Air Quality was a signatory to any of the CBAs.

Air Quality operated out of the same location as AQE under the same management, using the same equipment, and employing the same workforce. As a result, the indictment alleges that the companies were actually "a single business."

"[W]henever conditions permitted," the defendants paid employees from the payroll of Air Quality rather than that of AQE because that choice was "generally financially advantageous." By doing so and reporting to the MLBF only the hours worked by union members paid from the payroll of the union signatory AQE, the defendants allegedly failed to report all of the hours they were obligated to report and failed to make the required amount of contributions to the MLBF. The indictment further alleges that this "double-breasted shop" arrangement violated the CBA and that the defendants "concealed and caused to be concealed" from the MLBF the payment from the payroll account of Air Quality for work covered by the CBA.

3

The indictment also alleges that the defendants failed to report and to make benefit contributions for "shop hours" (time spent preparing for and traveling to a job site at the beginning of a workday and returning and unloading trucks and equipment at the end of a workday) that union members worked for AQE.

On January 19, 2016, the defendants were indicted on eighteen counts of mail fraud, in violation of 18 U.S.C. § 1341; one count of theft or embezzlement from an employee benefit plan, in violation of 18 U.S.C. § 664; and eighteen counts of making false ERISA statements, in violation of 18 U.S.C. § 1027. The indictment also included forfeiture allegations for any property traceable to the commission of the alleged mail fraud.

## DISCUSSION

## I.   Standard of Review

Federal Rule of Criminal Procedure 12(b)(3) allows defendants to make a pretrial motion challenging a defective indictment that fails to state an offense. "When grading an indictment's sufficiency, we look to see whether the document sketches out the elements of the crime and the nature of the charge so that the defendant can prepare a defense and plead double jeopardy in any future prosecution for the same offense." United States v. Cameron, 699 F.3d 621, 635 (1st Cir. 2012) (quoting United States v. Guerrier, 669 F.3d 1, 3 (1st Cir. 2011)). The inquiry at this stage is not whether the government

has sufficient evidence to prove the crime, but whether the
allegations in the indictment are sufficient on their face.
Guerrier, 669 F.3d at 3-4.

## II.  **Charged Offenses**

To prove mail fraud, the government must show "(1) a scheme
to defraud based on false pretenses; (2) the defendant's knowing
and willing participation in the scheme with the intent to
defraud; and (3) the use of interstate mail . . . communications
in furtherance of that scheme." United States v. Soto, 799 F.3d
68, 92 (1st Cir. 2015) (alteration in original) (quoting United
States v. Hebshie, 549 F.3d 30, 35 (1st Cir. 2008)).

To prove theft or embezzlement from an employee benefit
plan, the government must show that the defendant "embezzle[d],
st[ole], or unlawfully and willfully abstract[ed] or convert[ed]
to his own use . . . any of the moneys . . . of any employee
welfare benefit plan or employee pension benefit plan." 18
U.S.C. § 664.

To prove the making of false ERISA statements, the
government must show that the defendant "ma[de] any false
statement or representation of fact, knowing it to be false, or
knowingly conceal[ed], cover[ed] up, or fail[ed] to disclose any
fact the disclosure of which is required by [ERISA]." Id.
§ 1027.

## III. <u>Fraudulent Misrepresentation of Corporate Relationship</u>

The government argues that the required elements of each of the three charged offenses are met by its allegation that the defendants mailed false remittance reports to the MLBF and, based on the underreporting of hours in those remittance reports, failed to pay the full value of benefit contributions to which the MLBF was entitled. According to the government, the remittance reports were false because they failed to report hours that union members worked for Air Quality.

The defendants argue that the indictment fails to state an offense because the remittance reports properly included only union members' work for AQE and not for Air Quality. The defendants claim that only AQE's hours had to be reported to the MLBF because Air Quality and AQE were part of a lawful "double-breasted" operation.

A double-breasted operation is a business comprised of both union and non-union companies in which the non-union company bids on contracts that do not require a union contractor and the union company bids on union contracts. <u>Mass. Carpenters Cent. Collection Agency v. A.A. Bldg. Erectors, Inc.</u>, 343 F.3d 18, 22 (1st Cir. 2003) (citing <u>C.E.K. Indus. Mech. Contractors, Inc. v. NLRB</u>, 921 F.2d 350, 352 n.3 (1st Cir. 1990)). Such double-breasted arrangements are "neither uncommon nor inherently

unlawful." Id.; see also A. Dariano & Sons, Inc. v. Dist. Council of Painters No. 33, 869 F.2d 514, 517 (9th Cir. 1989).

The government recognizes that the operation of a double-breasted structure is, by itself, lawful. However, the government alleges that under the defendants' fraudulent scheme, the union and non-union companies were not actually two separate companies but rather a single company with the same location, workforce, equipment, and management.[1] In sum, the government alleges that Air Quality and AQE were actually a single business in which Air Quality was bound by the CBAs that AQE signed, but that the defendants fraudulently misrepresented that their business was a lawful double-breasted operation with two separate companies, one subject to the CBAs and the other not.

The defendants' response is that they made no misrepresentation because the two companies were separate businesses for CBA purposes. They also point out there is no allegation that AQE shifted union work to Air Quality.

---

[1]   Although this allegation is not made in the indictment, the government also suggested at the motion hearing that it had evidence of the intermingling of the companies' finances. Specifically, the government claimed that the defendants shifted funds from the union company AQE to the non-union company Air Quality to pay for Air Quality's employment of union workers. The government also claims that there were instances in which AQE timecards were crossed out and "Air Quality" was written on the top, and that employees were paid out of the same office. The court cannot consider these allegations in a motion to dismiss.

Specifically, the defendants point to the "alter ego" and "reverse alter ego" theories of civil liability for double-breasted operations and argue that not even civil liability would attach in this case. Their argument fails.[2]

Under the alter ego theory, civil liability for CBA benefit contributions may be imposed on a company that is an "alter ego" of another company where the former is used to evade the latter's CBA obligations. Mass. Carpenters Cent. Collection Agency v. Belmont Concrete Corp., 139 F.3d 304, 307-08 (1st Cir. 1998). The First Circuit has explained that "[i]n determining whether a nonsignatory employer is an alter ego of a signatory, we consider a variety of factors, including continuity of ownership, similarity of the two companies in relation to management, business purpose, operation, equipment, customers, supervision, and anti-union animus -- i.e., 'whether the alleged alter ego entity was created and maintained in order to avoid labor obligations.'" Id. at 308 (quoting NLRB v. Hosp. San Rafael, Inc., 42 F.3d 45, 50 (1st Cir. 1994)). None of these individual factors is determinative, and not all of the factors need to be present for alter ego status to be found. Id.

---

[2]   This Court has found no criminal cases that have relied on the alter ego theory, and no such case has been cited to this Court.

The defendants argue that civil liability under the alter ego theory exists only where an existing union company creates a non-union affiliate to escape its CBA obligations and that there can be no such liability in a "reverse alter ego" situation in which the non-union company preexists its union affiliate. Relying primarily on the First Circuit's decision in A.A. Building Erectors, Inc., 343 F.3d at 22, they argue that in a "reverse alter ego" situation, the arrangement cannot be an attempt to escape preexisting CBA obligations since the creation of a union affiliate expands rather than diminishes opportunities for union members. As such, the defendants argue, the fact that the non-union company Air Quality preexisted the union company AQE means that the two companies must be treated as separate under the CBAs.

But the order of creation of the union and non-union aspects of the double-breasted operation is not determinative for purposes of "alter ego" liability. In A.A. Building Erectors, Inc., the First Circuit left open the possibility that civil liability may still attach to a union affiliate set up by a preexisting non-union company, so long as "the [alter ego] doctrine's purposes would be served by its application in such a situation." Id. After all, whatever the timing in which the union and non-union parts of a double-breasted operation were established, the mere existence of that parallel structure makes

it possible to skirt CBA obligations by siphoning off union work to the non-union affiliate. The timing of corporate formation may have some bearing on the government's allegation that the defendants fraudulently used their corporate structure to evade CBA obligations, but the First Circuit has emphasized the alter ego doctrine's flexibility. Id.

The defendants err in suggesting that the Ninth Circuit's decision in Southern California Painters & Allied Trades, District Council No. 36 v. Rodin & Co. held otherwise. 558 F.3d 1028, 1033 (9th Cir. 2009). The Ninth Circuit's refusal to recognize reverse alter ego civil liability was limited to the facts before it, in which there was "no evidence that joint operations between [the non-union company] and [the union company] were for the purpose of avoiding [the union company]'s obligations under the [CBA]." Id. Had there been an allegation of such anti-union intent in Rodin, or evidence that the non-union company helped the union company avoid union obligations, the court may have sculpted a different outcome under either the "reverse" alter ego or alter ego theories.

The indictment states the criminal offenses with sufficient adequacy to survive the defendants' motion to dismiss. To prove those stated criminal offenses at trial, the government must prove more than the existence of a double-breasted operation. Instead, the government will have to prove that the defendants

underreported hours in remittance reports and improperly
withheld payments owed to the MLBF, and did so with the
requisite criminal intent.

**IV.  "Shop Hours" Allegation**

The indictment also alleges that AQE fraudulently failed to
make required contributions to the MLBF for AQE employees' shop
hours. The defendants point to the definition of covered work in
the CBA to argue that AQE had no obligation under the CBA to
report shop hours.

In Article XVIII, Section 2 of the CBAs, covered work is
defined as "[t]he removal, handling and/or packaging of
asbestos, lead paint, microbial, mold and all hazardous and
toxic materials, oil and fuel tanks and other contaminates."
While shop hours are not expressly included in that definition,
time spent preparing, traveling, and unloading might reasonably
be read as part of "removal, handling, and/or packaging." Based
on this limited record, the Court does not read the language
about subcontractors in Article II, Section 7 of the CBAs to
suggest otherwise. That CBA obligations do not extend to
subcontractors who "furnish[] trucking or transportation" says
nothing about whether the CBAs cover shop hours spent by
demolition workers who engage in trucking or transportation as
part of their environmental remediation work.

As such, the government's shop hours allegations survive
the defendants' motion to dismiss. Going forward, it bears
noting that the government must do more than prove a mere
contractual breach by the defendants. To make out a criminal
case, the government must prove that the exclusion of shop hours
from the reports and payments made to the MLBF was fraudulent.

## V.    **Vagueness**

Finally, the defendants argue that the indictment must be
dismissed for reason of vagueness, as the criminal offenses are
not defined with sufficient definiteness to give notice of
criminal conduct. They point out that there are sophisticated
labor lawyers who are of the opinion that the arrangement was
lawful. This challenge is premature, as the question of whether
the criminal offenses are vague as applied to the defendants'
conduct needs to be decided in context of the evidence presented
at trial. United States v. Harris, No. CR 09-10243, 2012 WL
2402788, at *3 (D. Mass. June 26, 2012) (citing United States v.
Reed, 114 F.3d 1067, 1070 (10th Cir. 1997)).

**ORDER**

This Court **DENIES** the defendants' motion to dismiss the indictment (Docket No. 39).


/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge